# EXHIBIT 68

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ROBERT D. GORDON, Receiver of Legisi
Marketing, Inc., et al.,

        Plaintiff,

v.

MAZU PUBLISHING INCORPORATED
an Oregon corporation, MATTHEW JOHN
GAGNON, and DOUGLAS RICHARD
SKORDAL,

        Defendants.

Case No. 09-13953

Hon. George Caram Steeh

---

| | |
|---|---|
| CLARK HILL PLC<br>Edward J. Hood (P42953)<br>Norma M. Gant (P45311)<br>Attorneys for Plaintiff<br>500 Woodward Ave., Suite 3500<br>Detroit, MI 48226-3211<br>(313) 965-8300 | LAW OFFICES OF ANTHONY J. DEGIDIO<br>Anthony J. DeGidio<br>Attorney for Defendants Mazu Publishing<br>and Matthew Gagnon<br>712 Farrer St.<br>Maumee, OH 43537<br>(419) 740-2556 |
| Douglas Richard Skordal<br>Pro Se Defendant/Counter-Plaintiff<br>and Cross-Plaintiff<br>20195 SW Pike Street<br>Beaverton, OR 97007 | SCOTT A. CIOLEK<br>Ciolek Ltd.<br>Attorney for Defendants Mazu Publishing<br>and Matthew Gagnon<br>520 Madison Ave., Suite 820<br>Toledo, OH 43604<br>(419) 740-5935 |

---

## PLAINTIFF ROBERT D. GORDON'S MOTION FOR SUMMARY JUDGMENT ON FRAUDULENT TRANSFER CLAIMS

Plaintiff, Robert D. Gordon, in his capacity as court-appointed receiver for the estates of Gregory McKnight, Legisi Holdings, LLC, Legisi Marketing, Inc. and related entities, moves for summary judgment on his claims for fraudulent transfer under the Michigan Uniform Fraudulent Transfer Act, MCL 566.31, *et seq.*, as contained in Counts I and II of Mr. Gordon's Complaint.

In support of his motion, Mr. Gordon relies on the attached brief and exhibits.

Counsel for Mr. Gordon sought concurrence in the relief requested in this motion on July 20, 2010. Concurrence was not granted, thus necessitating this motion.

WHEREFORE, Mr. Gordon respectfully requests that the Court grant his motion for summary judgment on Counts I and II of his Complaint, and enter Judgment against the Defendants in the following amounts: against Matthew J. Gagnon, $1,691,870.53; against Douglas R. Skordal, $1,331,029.50; and against Mazu Publishing, Inc., $810,359.18.

<div style="margin-left:40%;">

Respectfully submitted,
CLARK HILL PLC


By:   /s/ Edward J. Hood
      Edward J. Hood
      500 Woodward Avenue, Ste. 3500
      Detroit, Michigan 48226-3435
      (313) 965-8300
      ehood@clarkhill.com
      P42953

      *Attorneys for Robert D. Gordon Receiver of the*
      *Estates of Gregory N. McKnight, et al.*

</div>

Date: July 21, 2010

1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ROBERT D. GORDON, Receiver of Legisi
Marketing, Inc., et al.,

                Plaintiff,

v.

MAZU PUBLISHING INCORPORATED
an Oregon corporation, MATTHEW JOHN
GAGNON, and DOUGLAS RICHARD
SKORDAL,

                Defendants.

Case No. 09-13953

Hon. George Caram Steeh

---

CLARK HILL PLC
Edward J. Hood (P42953)
Norma M. Gant (P45311)
Attorneys for Plaintiff
500 Woodward Ave., Suite 3500
Detroit, MI 48226-3211
(313) 965-8300

Douglas Richard Skordal
Pro Se Defendant/Counter-Plaintiff
and Cross-Plaintiff
20195 SW Pike Street
Beaverton, OR 97007

LAW OFFICES OF ANTHONY J. DEGIDIO
Anthony J. DeGidio
Attorney for Defendants Mazu Publishing
and Matthew Gagnon
712 Farrer St.
Maumee, OH 43537
(419) 740-2556

SCOTT A. CIOLEK
Ciolek Ltd.
Attorney for Defendants Mazu Publishing
and Matthew Gagnon
520 Madison Ave., Suite 820
Toledo, OH 43604
(419) 740-5935

---

## BRIEF IN SUPPORT OF PLAINTIFF ROBERT D. GORDON'S MOTION FOR SUMMARY JUDGMENT ON FRAUDULENT TRANSFER CLAIMS

# TABLE OF CONTENTS

STATEMENT OF QUESTIONS INVOLVED.................................................................. ii

CONTROLLING OR MOST APPROPRIATE AUTHORITIES ................................. iii

INTRODUCTION ............................................................................................................ 1

STATEMENT OF FACTS ............................................................................................... 1

    Legisi Program.......................................................................................................... 1

    Mazu Defendants ...................................................................................................... 2

    The Defendants' Role in Legisi ................................................................................ 3

    Legisi Was a Ponzi Scheme from Inception ............................................................ 6

        1.    Legisi had no income to support more than $27 Million in payments to investors........ 7

        2.    Legisi's investments were dismal failures ................................................... 7

        3.    Legisi made over $6 Million in net transfers to McKnight and the Defendants............ 9

    Mr. Gordon Seeks to Avoid the Net Transfers to the Defendants Totaling $3,833,259.21 ..... 10

ARGUMENT..................................................................................................................... 12

    I.    SUMMARY JUDGMENT STANDARD ...................................................... 12

    II.    SUMMARY JUDGMENT FOR MR. GORDON IS PROPER ON COUNTS I AND II, ALLEGING FRAUDULENT TRANSFERS UNDER THE MICHIGAN UFTA ...... 13

        A.    Summary Judgment is Proper on Count I........................................... 13

        B.    Summary Judgment is Proper on Count II.......................................... 16

            1.    Legisi was insolvent from its inception ......................................... 17

            2.    Defendants did not provide "reasonably equivalent value" for the transfers ... 17

        C.    Judgment is Proper Against Gagnon and Skordal, as Well as Mazu.................... 18

CONCLUSION/RELIEF REQUESTED.............................................................. 19

## STATEMENT OF QUESTIONS INVOLVED

I.    Whether the Court should grant summary judgment in Plaintiff's favor on his fraudulent transfer claim pursuant to MCL 566.34(1), where there are no genuine issues of material fact that (a) the transferor was a Ponzi scheme that as a matter of law made the transfers with the actual intent to defraud; (b) the Defendants directly or indirectly received net transfers of $3,833,259.21; and (c) the Defendants did not provide receive the transfers in exchange for reasonably equivalent value.

II.    Whether the Court should grant summary judgment in Plaintiff's favor on his fraudulent transfer claim pursuant to MCL 566.35(1), where there are no genuine issues of material fact that (a) the transferor was a Ponzi scheme that as a matter of law was insolvent from its inception; (b) the Defendants directly or indirectly received net transfers of $3,833,259.21; and (c) the Defendants did not provide receive the transfers in exchange for reasonably equivalent value.

6645414.1 30711/132750

## CONTROLLING OR MOST APPROPRIATE AUTHORITIES

### Cases

*Conroy v. Shott,* 363 F.2d 90 (6th Cir. 1966)

*Terry v. June,* 432 F. Supp. 2d 635 (W.D. Va. 2006)

*SEC v. George,* 426 F.3d 786, 799 (6th Cir. 2005)

*Mosburg v. Vecchioni,* 1999 U.S. Dist. Lexis 4733 (E.D. Mich. 1999)

*Warfield v. Byron,* 436 F.3d 551, 558 (5th Cir. 2006)

*Baxter v. Palmigiano,* 425 U.S. 308, 318-319, 96 S. Ct. 1551, 47 L. Ed. 2d 810 (1976)

### Statutes

MCL 566.34

MCL 566.35

## INTRODUCTION

Plaintiff-Receiver Robert D. Gordon moves for summary disposition on his fraudulent transfer claims (Counts I and II). The Defendants, Mazu Publishing, Inc., Matthew Gagnon, and Douglas Skordal, promoted Legisi, a Ponzi scheme, through a self-styled "business opportunity review" website, www.mazu.com. Legisi made net transfers to the Defendants of $3,833,259.21. Mr. Gordon filed this case to set aside and recover those transfers under the Michigan Uniform Fraudulent Transfer Act, MCL 566.31, *et seq.* The admissions, evidence, and inferences establish that there is no genuine issue of material fact, and Mr. Gordon is entitled to judgment as a matter of law on the fraudulent transfer claims.

## STATEMENT OF FACTS

**Legisi Program**

This case is an offshoot of the Securities and Exchange Commission's enforcement action in Case No. 08-11887 against Gregory McKnight, Legisi Holdings, and others relative to an internet investment program-turned Ponzi scheme named "Legisi."[1] In December 2005, McKnight introduced an investment offer on the website www.Legisi.com. McKnight, on behalf of Legisi Holdings and Legisi Marketing, made claims that he would invest offering proceeds and pay investors from profits from the investments. Mazu/Gagnon Answer, ¶ 15 (Exhibit 1); Skordal Answer, ¶ 15 (Exhibit 2). On the Legisi website, McKnight offered members of the public an investment opportunity with returns of 6% to 15% *per month.* Declaration of Paul Forrest Hickman, Office Manager, Internet Archive, attaching various versions of www.Legisi.com (Exhibit 3). McKnight claimed that Legisi could offer such returns because Legisi's own investments exceeded the returns offered to its investing "members." *Id.,* Attachment 8, p. 2 ("5. How do you pay out such high returns? We are obviously receiving a

---

[1] Legisi is an acronym conceived by McKnight: Lucrative Electronic Gold Income Services International.

1

higher return on our invested funds. We repay our Members and keep a small profit for ourselves. Everybody's happy.")

Between December 2005 and November 2007, McKnight attracted $72.6 Million from investors around the world. Declaration of Kevin Barrett, Accountant, Securities and Exchange Commission Division of Enforcement (Exhibit 4). McKnight had help in attracting investors, however. In late 2005, when he hatched the Legisi scheme, McKnight had a series of telephone calls with his business acquaintances, Defendants Matt Gagnon and Doug Skordal. Deposition of Matthew Gagnon, p. 171 (Exhibit 5); www.mazu.com as of March 27, 2006 (Exhibit 6).

**Mazu Defendants**

Gagnon is the sole officer, shareholder and director of Defendant Mazu Publishing, Inc. ("Mazu"). Mazu/Gagnon Answer, ¶ 11. Mazu is an Oregon corporation that provided "business opportunity reviews" to visitors of its website www.mazu.com. Mary Koehn, Mazu's office manager from 2000 to 2007, testified that Gagnon was "the owner, the idea man." Koehn Deposition, p. 44 (Exhibit 7). Defendant Skordal is Gagnon's former brother-in-law. According to Gagnon, Skordal was involved in sales and marketing and was Mazu's "webmaster" tasked with uploading content to the Mazu website. Gagnon Deposition, pp. 64-65. In his Answer, Skordal admitted that he edited material that appeared on the Mazu website. Skordal Answer, ¶ 31. At his deposition, however, Skordal invoked his Fifth Amendment privilege and refused to answer any questions about his role in Mazu. Skordal Deposition, p. 16 (Exhibit 8).

Four to five years before McKnight started Legisi, McKnight became acquainted with Gagnon and Skordal by ordering a product on the internet from Mazu, and through a multi-level marketing program called "Mannatech." Gagnon Deposition, p. 84. McKnight also became involved in an "Electronic Currency Exchange Program" offered by Mazu, and provided testimonials that appeared on the Mazu website. (Exhibit 9). Gagnon recalls that McKnight was

2

"[n]ot particularly successful" in Mannatech, adding "[b]ut that success is based primarily on someone that is good at sales and marketing, which it was not in my opinion that he was." Gagnon Deposition, p. 85. For sales and marketing help with Legisi, McKnight turned to Defendants Gagnon and Skordal.

**The Defendants' Role in Legisi**

Mazu agreed to provide marketing support for Legisi and that Legisi agreed to pay Mazu referral fees and a portion of Legisi's net profits. Mazu/Gagnon Answer, ¶ 22; Skordal Answer, ¶ 22. Mazu's customer support services consisted of answering questions over the telephone and moderating an on-line chat room known as the "Legisi Forum." Mazu/Gagnon Answer, ¶ 33; Skordal Answer, ¶ 33.

Mazu marketed the Legisi Program through personal letters from Gagnon that were published on the Mazu website. Koehn Deposition, pp. 60-61. Mazu had an impressive following on the internet: Gagnon testified that, at its peak in 2005, Mazu's website, www.mazu.com, attracted two to three million visitors per year. Gagnon Deposition, p. 53. Gagnon invoked his Fifth Amendment privilege relative to why the traffic decreased in 2006 and 2007, when Mazu was marketing Legisi. *Id.*

On the Mazu website, Gagnon personally endorsed the Legisi Program through a signed testimonial bearing Gagnon's photograph and signature. In the testimonial, Gagnon described himself as an "author, home business mentor, direct marketing expert, investor, Dad, and business opportunity junkie" who had "taught tens of thousands of people from all over the world how to make millions of dollars on the Internet. Yes, *millions!*" Mazu/Gagnon Answer, ¶ 24; Skordal Answer ¶ 24.

Gagnon further described the Legisi Program as one that he endorsed after personal investigation and investment. Among other things, Gagnon stated:

3

6645414.1 30711/132750

Remember, I said that one of the greatest benefits of being in business all of these years is the relationships that Mazu's created and the people we've met. When a Mazu Partner came to us and wanted to put together a program that offered high level returns with low risk, given what we'd seen out there in the marketplace, we knew he had a winner. That relationship spawned a series of meetings and ultimately the program that you are just now learning about. It's not a trick, it's not a scam, there's nothing fancy or difficult about it. It's a simple loan program where you get to determine the terms in which you're paid back.

Want 8.5% interest paid to your account monthly? Great! Want 10 or even 12% (now 15%!)? No problem. Those plans are available too. If you choose to compound your repayments back into your account (optional), look at what happens to your deposit!

**That's right!!** Compounding a repayment rate of 10% back into your deposit over 12 months more than *TRIPLES* your working capital....see for yourself!

. . . .

Think of it....Mazu's credibility, high yield returns in the form of "repayments" to you, and you don't have to do anything to do very well. Well, nothing other than fund an account. I've put thousands of my own hard-earned dollars into this as an investment and it's paying off big-time! That's how much confidence I have in it!

Mazu/Gagnon Answer, ¶ 25; Skordal Answer, ¶ 25.

Gagnon described the Legisi Program as "the easiest way of making money I have ever seen", offering "10 to 12.5% on your money *per month* with No Work and Little to No Risk!", and the program that allowed him to "100% retire". (emphasis in original). Mazu/Gagnon Answer, ¶ 27; Skordal Answer, ¶ 27. In addition to exhorting the general public to deposit money in Legisi, Gagnon urged readers to "Tell 3 friends about the program" and "spread the word." Mazu/Gagnon Answer, ¶ 28; Skordal Answer, ¶ 28.

Other than knowing McKnight as a Mazu customer, Gagnon remembered that McKnight was a "robotics engineer" at General Motors, but could not recall his investment experience or business or management experience. Gagnon Deposition, pp. 92-93; 176-177. And yet, when

4

marketing Legisi, Gagnon described with unabated conviction how Legisi could deliver 8.5% monthly (or more) to investors:

### How are profits being made?

You're probably thinking.... "Why in the world would someone pay me 12% on my money every month for doing absolutely nothing?"

That's a great question with a very simple answer. . . because we know how to earn more than 8.5 to 12% with it in that time in situations with minimal to no risk. Because we can use your money, turn a profit of 15 or 20%, or better, pay you your 10 or 12%, and still walk away with a handsome profit. It's logical and It's completely legal.

We're able to tap into the very lucrative Forex (Foreign Exchange) and Comex (Commodities Exchange) arenas and also the Stock Market. Profits from these investments as well as Internet Marketing and Arbitrage Trading activities are used to enhance the greater program and Increase stability for the long term for all participants.

http://web.archive.org/web/20060327135159/www.mazu.com/offer.html (Exhibit 6).

Gagnon testified that, although this statement is attributed to him on the website, McKnight "probably" prepared the text:

14 Q. Under the heading how are profits being made, in the
15 second paragraph, you say, quote, that's a great
16 question with a very simple answer, because we know
17 how to earn more than 8.5 to 12 percent with it in
18 that time and situations with minimal to no risk, end
19 quote. Do you see that?
20 A. Yes.
21 Q. Who prepared that text?
22 A. Probably McKnight.
23 Q. What other portions of Exhibit 12 did McKnight
24 prepare?
25 A. Probably some of the bottom paragraphs, that's

Page 173

1 probably about it.
2 Q. But you let it go on your site?
3 A. These numbers.

5

4 Q. Right, you let it go on Mazu?
5 A. Yes.
6 Q. In fact, on the 14th page you sign it. Did you
7 approve that statement?
8 A. It was my sales letter, so I created 80 percent of
9 that sales letter. I always sign my sales letters.
10 Q. So when it says, we know how to earn more than 8.5 to
11 12 percent, the way this reads, that statement is
12 attributed to you; isn't it?
13 A. I suppose the way you are reading it, yes.

Gagnon Deposition, pp. 172-173.

In later versions of the Mazu website, Gagnon represented that Legisi was making more
than 15% with investor money. Exhibit 10. The sole basis for that representation was
McKnight:

5 Q. The click through is 1 of 4. I would like you to go
6 to 3 of 4. Directing your attention to the third full
7 paragraph, it talks about McKnight making 15 percent
8 plus on the money and keeping the difference. Do you
9 see that?
10 A. Yes.
11 Q. What evidence did you have that McKnight was making 15
12 percent on his money?
13 A. He told us.
14 Q. Anything else?
15 A. No.

Gagnon Deposition, p. 179. Similarly, Gagnon never obtained any paper to verify the claims of
investment returns that McKnight was making. Gagnon Deposition, p. 249.

**Legisi Was a Ponzi Scheme from Inception**

Even while Gagnon was making claims to potentially millions of visitors to Mazu.com
about Legisi's investing prowess, the truth was quite the opposite. Based on records obtained by
the SEC, Legisi was never profitable, was insolvent from inception, and was a Ponzi scheme
inasmuch as it used funds from new investors to satisfy claims of older investors. Three facts
lead inexorably to the conclusion that Legisi was a Ponzi Scheme:

6

6645414.1 30711/132750

1. <u>Legisi had no income to support more than $27 Million in payments to investors</u>

Of all the money received in accounts owned or controlled by McKnight, at least $72,599,862.95, or 98.76%, represented funds received from Legisi investors. Barrett Declaration, Exhibit A. The remaining funds, $908,573.47, or 1.24%, came from non-investor or unidentified sources. *Id.* Legisi paid to investors a total of $27,548,547.65. *Id.* at ¶ 8. Therefore, of the amounts Legisi paid to investors, at least $26,639,974.18 came from new investors or existing investors making new investments, and not from legitimate business activities.

2. <u>Legisi's investments were dismal failures</u>

During its existence between December 2005 and May 2008, Legisi failed to generate any significant net investment income. Instead, investment activities suffered realized net losses. *Id.* at ¶¶ 9-11. From its inception in December 2005 until August 2006, the Legisi's sole "investments" consisted of extremely risky "High Yield Investment Programs," or "HYIPs".[2] Legisi's HYIP investments resulted in a **loss of more than $93,000**. *Id.* at ¶ 11. That was just the beginning of a series of devastating losses with investor funds.

In August 2006, McKnight began investing Legisi funds in foreign currencies. In December 2006, McKnight began investing Legisi funds in commodities futures. From August 2006 through August 2007, McKnight invested approximately $11.7 million of investor funds in foreign currencies, commodities futures, and options on commodities futures. McKnight **lost approximately $3.7 million** on these investments. *Id.* at ¶ 10. In fact, McKnight sustained

---

[2] McKnight himself prepared a document entitled "HYIP Secrets Revealed" (Exhibit 13), which was published in 2005. Gagnon Deposition, p. 185. In that document, McKnight described HYIPs as "not just High Yield, it's High Risk!" McKnight also noted that "as many as 97% of the HYIP programs out there are fraudulent programs run by scammers. They are just there to take your money and run." Equally ironic, in February 2006 Mazu's confidence game included a warning about the dangers of HYIPs, noting that the "U.S. Treasury Department reports that over $500 Billion was reportedly lost to HYIPs both online and off in the last 10 years" and proclaiming "[w]e'll never give the scamming HYIPs one more dollar." (Exhibit 14).

extremely heavy losses in these accounts during all of 2006, and despite healthy gains in four months in 2007, still was a net loser. *Id.*

Beginning in March 2007, McKnight made a series of poor investments through two Florida brokers. Affidavit of Robert Gordon (Exhibit 11). On March 1 and 2, 2007, McKnight invested **$262,500** in the stock of Edgetech on the recommendation of Elite Consulting, an unregistered broker. That investment was a **total loss**. *Id.* at Exhibit A. Next, McKnight made a series of investments through Sierra Equity Group, a small securities broker in Boca Raton, Florida. These investments fared poorly as well. Aside from small (< $100,000) gains in late 2007 from unrestricted securities, Barrett Declaration, Exhibit C, McKnight's investments through Sierra were an unmitigated disaster. These investments included:

- <u>All American Home Products Notes</u>:  Between March 2007 and August 2007, Legisi made loans totaling $3,943,000 to All American Home Products, a Florida hurricane window and shutter company. These loans were documented in convertible notes. All American never made any payments on the notes. In December 2008, Mr. Gordon filed a lawsuit in this Court against All American. On April 13, 2009, the Court entered a default judgment against All American in the amount of $3,789,009.62, which did not include a $750,000 note which McKnight may converted to equity in All American Home Products. All American made an assignment for the benefit of creditors. Mr. Gordon has received less than $25,000 in collection, for a **loss of $3.9 Million**.

- <u>Brekford International</u>:  In March 2007, McKnight invested $4,250,000 in Legisi funds in Brekford International (f/k/a Tactical Solutions Partners) on Sierra's recommendation through a private placement transaction. The securities were restricted. After months of negotiation, Mr. Gordon sold the Brekford stock back to Brekford, for $700,000, for a **loss of $3.55 Million**.

- <u>PC Universe</u>:  In April and May 2007, McKnight invested **$2.5 Million** in PC Universe. That investment was a **total loss**.

- <u>Royal Palm Realty Fund</u>:  In May and June 2007, McKnight invested **$9,340,068.55** of Legisi investor funds in a startup real estate fund operated by the three individuals involved in Sierra – Alan Goddard, Michael Lichtenstein and Eric Bloom – together with Sierra's attorney, Bruce Rosetto, Rosetto's wife, Roxanne Rosetto, and Rosetto's son, Robert Rosetto. Legisi was the only investor in Royal Palm. Legisi never realized any return on the Royal Palm investment. Legisi suffered unrealized losses immediately upon investing in Royal Palm. Sierra and the Rosettos charged Royal Palm ravenous

commissions and "management fees" in excess of $1 million. Moreover, unbeknownst to McKnight, Royal Palm's general partner, RP Management, was to receive a 50% ownership interest in Royal Palm, without making any capital contribution, and over and above management fees charged by RP Management. Mr. Gordon has filed suit against Sierra, the Rosettos, and RP Management in Case No. 09-11770, pending before Judge Cook. Mr. Gordon has also instituted arbitration proceedings against Sierra through FINRA. As of this time, however, the Royal Palm investment has been a **total loss.**

- Brain Matters: In August 2007, McKnight invested **$2.675 Million** in Legisi funds in Brain Matters. Shortly thereafter, Brain Matters declared bankruptcy. That investment was a **total loss**.

- Pacific Asia Petroleum: The sole bright spot in McKnight's investments through Sierra was Pacific Asia Petroleum. McKnight purchased approximately 1.7 million shares of Pacific Asia. These securities were restricted and not freely tradable until November 2, 2009, when the court ordered the restriction lifted. Since that time, Mr. Gordon has been able to liquidate about one-third of the Pacific Asia stock for a net gain to date of close to $500,000.

Exhibit A to Mr. Gordon's affidavit summarizes the investments the estates made through Elite and Sierra, other than the unrestricted securities bought and sold by Legisi in 2007. To date, these investments have suffered a **net loss of $21.7 Million.** In addition, Mr. Gordon's affidavit details various local real estate investments made by McKnight with Legisi investor funds during 2007. To date, those investments have suffered a **net loss of $562,345.46.** *Id.,* Exhibit B. Thus, it is plain that these assets did not provide Legisi with business income to satisfy its obligations to investors.

### 3. Legisi made over $6 Million in net transfers to McKnight and the Defendants

McKnight made transfers of $2,263,886.97 from Legisi investor funds, to or for the benefit of himself. Barrett Declaration, ¶ 12. In addition, McKnight made net transfers to Mazu and/or Gagnon of $3,833,259.21. *Id.* at ¶ 17. (Of that amount, $1,691,870.53 was transferred to Gagnon and $1,331,029.50 to Skordal).

These three data points – the transfer of over $27 Million to investors without any underlying legitimate business income, the devastating investment losses, and the transfer of

9

over $6 Million to himself and to the Defendants – demonstrate that Legisi was a Ponzi scheme. Mr. Barrett opines that "Legisi was a Ponzi scheme in the sense that virtually all of the $27,548,547 that McKnight transferred back to Legisi investors was derived from other investor funds and not derived from legitimate business income." Barrett Declaration, ¶ 14.

**Mr. Gordon Seeks to Avoid the Net Transfers to the Defendants Totaling $3,833,259.21**

The Barrett Declaration details that Legisi made total transfers of $4,532,512.21 to Mazu and Gagnon. Meanwhile, Mazu and Gagnon made total transfers to Legisi of $699,253 (the vast majority of which was recycled from Legisi transfers). Thus, the net transfers from Legisi to Mazu and Gagnon was $3,833,259.21. *Id.* at ¶ 17. Most of these transfers were made through "e-currency" accounts at "E-Bullion" and "E-Gold."

Mr. Gordon took the deposition of Defendant Skordal on May 27, 2010. Skordal invoked his Fifth Amendment privilege against self-incrimination as to substantially all of Mr. Gordon's questions, including all questions relative to "compensation that you received from Mazu, as well as from Legisi, whether in terms of wages and salaries, commissions, returns on loans, bonuses and profit sharing." Skordal Deposition, p. 18 (Exhibit 8).

Mr. Gordon took Defendant Gagnon's deposition on June 10, 2010. While he was more selective than Skordal, Gagnon invoked his Fifth Amendment privilege with respect to:

- Legisi transfers to e-currency and other accounts (pp. 19, 24, 73);
- Specific transfers from Legisi (pp. 194-195);
- The details and terms of the Mazu-Legisi relationship (pp. 82, 95, 117);
- Mazu's marketing/promotion of Legisi (pp. 44, 83, 121);
- The role of each of Mazu's employees in Legisi (pp. 65-66);
- Whether he ever believed Legisi was insolvent or unable to repay members (pp. 102, 103, 105, 113, 114).

Gagnon did testify, however, that he had sole authority to transfer any funds out of Mazu's E-Bullion account. Gagnon Deposition, p. 151-152. Gagnon testified that he has no E-

Bullion account records, but that the account number ending in 4285 "sounds like the number I had." Gagnon Deposition, pp. 197, 201-202

Based on the above data, admissions and adverse inferences, Mr. Gordon seeks to avoid, and obtain judgment as to, transfers to Gagnon in the amount of $1,691,870.53. This amount consists of (a) net transfers from Legisi to Gagnon's E-Gold account ending in 1461 ($184,037.21); (b) transfers from Mazu's E-Bullion account ending in 4285 to or for the benefit of Gagnon ($758,886.32), including transfers to pre-paid debit cards that Gagnon admittedly owned,[3] transfers to Gagnon's wife[4] and other relatives; and (c) transfers from Legisi to Mazu's E-Bullion account ending in 4285 to Mazu's Bank of America account to Gagnon, from which Gagnon made personal use ($748,947). These amounts are broken down in Exhibit 12.

Mr. Gordon seeks to avoid, and obtain judgment as to, transfers to Skordal in the amount of $1,331,029.50, which is comprised of net transfers made from Mazu's E-Bullion account ending in 4285 to E-Bullion account ending in 8975 in the name of "Second Stream." Gagnon testified that the Second Stream account was owned by Skordal. Gagnon Deposition, p. 199.

Last, Mr. Gordon seeks to avoid, and obtain judgment as to, direct and indirect transfers to Mazu which were not subsequently transferred to Gagnon or Skordal, or which were wired to Mazu from the Mazu E-Bullion account. Those transfers total $810,359.18.

---

[3] Gagnon Deposition, p. 153.
[4] Gagnon testified that his wife, Jenny Poarch, "may have" had an E-Bullion account. Gagnon Deposition, p. 204.

11

## ARGUMENT

### I.  SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56(c) empowers the court to render summary judgment "forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *See Redding v. St. Eward*, 241 F.3d 530, 532 (6th Cir. 2001). The Supreme Court has affirmed the court's use of summary judgment as an integral part of the fair and efficient administration of justice. The procedure is not a disfavored procedural shortcut. *Celotex Corp. v. Catrett*, 477 U.S. 317, 327, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).

The standard for determining whether summary judgment is appropriate is "'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Amway Distributors Benefits Ass'n v. Northfield Ins. Co.*, 323 F.3d 386, 390 (6th Cir. 2003) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)). The evidence and all reasonable inferences must be construed in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986); *Redding*, 241 F.3d at 532. "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson*, 477 U.S. at 247-48 (emphasis in original); *see also National Satellite Sports, Inc. v. Eliadis, Inc.*, 253 F.3d 900, 907 (6th Cir. 2001).

If the movant establishes by use of the material specified in Rule 56(c) that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law, the opposing

12

party must come forward with "specific facts showing that there is a genuine issue for trial." *First Nat'l Bank v. Cities Serv. Co.,* 391 U.S. 253, 270, 88 S. Ct. 1575, 20 L. Ed. 2d 569 (1968); see also *McLean v. 988011 Ontario, Ltd.,* 224 F.3d 797, 800 (6th Cir. 2000).

## II.   SUMMARY JUDGMENT FOR MR. GORDON IS PROPER ON COUNTS I AND II, ALLEGING FRAUDULENT TRANSFERS UNDER THE MICHIGAN UFTA

Mr. Gordon moves for summary judgment on his fraudulent transfer claims contained in Counts I and II of the Complaint, which are based on the Michigan Uniform Fraudulent Transfer Act, MCL 566.31, *et seq.* The UFTA has been adopted by a vast majority of states and is "designed to prevent debtors from transferring their property in bad faith before creditors can reach it." *BMG Music v. Martinez,* 74 F.3d 87, 89 (5th Cir. 1996). As a result, courts look to the law of other jurisdictions that have adopted the UFTA for guidance in interpreting the Act. *SASCO 1997 NI, LLC v. Zudkewich,* 166 N.J. 579, 767 A.2d 469, 474 (N.J. 2001); *Macedo v. Bosio,* 86 Cal. App. 4th 1044, 104 Cal. Rptr. 2d 1, 4 (Cal. App. 2001).

As the Receiver for the Legisi Estates, Gordon has standing to assert fraudulent transfer claims, as he represents the interests of creditors. *Commodity Futures Trading Comm'n v. Am. Commodity Group Corp.,* 753 F2d 862, 866 (fn. 6) (11th Cir. 1984); *Scholes v. Lehmann,* 56 F.3d 750, 753 (7th Cir. 1995).

### A.   Summary Judgment is Proper on Count I

Count I is based on the actual fraud provision of MCL 566.34, which states:

> (1) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation in either of the following:

13

> (a) With actual intent to hinder, delay, or defraud any creditor of the debtor.[5]

Thus, transfers made with "actual intent to hinder, delay or defraud" are voidable fraudulent transfers, irrespective of the insolvency of the debtor. A creditor seeking to void a transfer under the actual fraud provision of the UFTA bears the burden of proving the elements of actual fraud. *Wachovia Securities, LLC v. Neuhauser,* 528 F. Supp. 2d 834, 858 (N.D. Ill. 2007). If the creditor carries its burden of proving actual fraud, then the burden shifts to the recipient of the transfer to prove the defense of good faith and reasonably equivalent value. *Warfield v. Byron,* 436 F.3d 551, 558 (5th Cir. 2006); *Terry v. June,* 432 F. Supp. 2d 635, 641 (W.D. Va. 2006) (applying Michigan law).

Transfers made by a "Ponzi Scheme" are deemed to have been made with "actual intent to hinder, delay or defraud" creditors. *Conroy v. Shott,* 363 F.2d 90, 92 (6th Cir. 1966); *In re Agricultural Research and Technology Group, Inc.,* 916 F.2d 528, 535 (9th Cir. 1990).

Legisi was a Ponzi scheme. A Ponzi Scheme is defined as:

> A fraudulent investment scheme in which money contributed by later investors generates artificially high dividends for the original investors, whose example attracts even larger investments. ● Money from the new investors is used directly to repay or pay interest to earlier investors, usu. without any operation or revenue-producing activity other than the continual raising of new funds. This scheme takes its name from Charles Ponzi, who in the late 1920s was convicted for fraudulent schemes he conducted in Boston.

BLACK'S LAW DICTIONARY (4th ed) (West 2004).

Courts have also characterized a "Ponzi scheme" as a "phony investment plan in which monies paid by later investors are used to pay artificially high returns to the initial investors, with the goal of attracting more investors." *United States v. Silvestri,* 409 F.3d 1311, 1317 (fn. 6)

---

[5] While Gordon also relies on the constructive fraud portion of MCL 566.34(1), this motion is based only on the actual fraud theory.

(11th Cir. 2005). Similarly, the Sixth Circuit has observed that, in a Ponzi scheme, "earlier investors' returns are generated by the influx of fresh capital from unwitting newcomers rather than through legitimate investment activity." *SEC v. George*, 426 F.3d 786, 799 (6th Cir. 2005), citing *SEC v. Credit Bancorp, Ltd.*, 290 F.3d 80, 89 (2nd Cir. 2002); and *SEC v. Forex Asset Mgmt. LLC*, 242 F.3d 325, 331 (5th Cir. 2001). Ponzi schemes exist where 1) deposits are made by investors; 2) the Debtor conducted little or no legitimate business operations as represented to investors; 3) the purported business operation of the Debtor produced little or no profits or earnings; and 4) the source of payments to investors was from cash infused by new investors. *Wiand v. Waxenberg*, 611 F. Supp. 2d 1299, 1312 (M.D. Fla. 2009), citing *In re Canyon Sys. Corp.*, 343 B.R. 615, 630 (Bankr. S.D. Ohio 2006).

In *Mosburg v. Vecchioni*, 1999 U.S. Dist. Lexis 4733 (E.D. Mich. 1999), Judge O'Meara found that a Ponzi scheme existed where the debtor had no or insignificant amounts of revenues, but funds were being paid to investors in the form of interest payments and commissions, such that the source of money to pay distributions would have been monies deposited by either new investors or investors who were investing new monies. *Mosburg*, 1999 U.S. Dist. Lexis 4733 at *16 -*17.

In this case the Legisi scheme had all of the trappings of a Ponzi scheme. Legisi attracted $72.6 Million in investor funds. Legisi had no legitimate business income from which it paid over $27 Million to investors. Barrett Declaration, ¶ 14. Consequently, any funds paid to earlier investors came from either new investors or new funds from existing investors. All of Legisi's investments failed, from its tragically ironic investment in HYIPs, to its comex and forex losses, to its restricted securities losses through Sierra, and its real estate investment losses. Barrett

15

Declaration; Gordon Affidavit. With no net investment income in its history, Legisi paid

investors with the only funding source it had: other investor money. Legisi was a Ponzi scheme.

Because Legisi was a Ponzi scheme, all of its transfers are deemed to have been made

with actual intent to hinder, delay or defraud its creditors, within the meaning of the Uniform

Fraudulent Transfer Act. *Conroy,* 363 F.2d at 92; *Mosburg,* 1999 U.S. Dist. Lexis at *16 - *18;

*Terry v. June,* 432 F. Supp. 2d 635, 639 (W.D. Va. 2006) (applying Michigan law); *Warfield v.*

*Byron,* 436 F.3d 551, 558 (5th Cir. 2006); *M & L Business Machine Co.,* 59 F.3d 1078, 1079-80

(10th Cir. 1995); *Scholes v. Lehmann,* 56 F.3d 750, 757 (7th Cir. 1995); *Hayes v. Palm Seedlings*

*Partners,* 916 F.2d 528, 535 (9th Cir. 1990); *In re Slatkin,* 310 B.R. 740, 748-49 (Bankr. C.D.

Cal. 2004); *In re Independent Clearing House Co.,* 77 B.R. 843, 860 (Bankr. D. Utah 1987)

(intent to defraud is adduced from fact that debtor must have known that Ponzi scheme would

inevitably collapse and that later investors would lose their investment); *Emerson v. Maples (In*

*re Mark Benskin Co., Inc.),* 1995 U.S. App. Lexis 16053, *12 (6th Cir. 1995).

Claimed ignorance is no defense: Although the evidence reveals that the Defendants in

this case knew or should have known that Legisi was a Ponzi scheme, a transferee's knowledge

is irrelevant to the determination of whether the transfer was made with intent to delay or

defraud. *Warfield v. Byron,* 436 F.3d 551, 558 (5th Cir. 2006).

Because the transfers to Mazu, and ultimately to Gagnon and Skordal, were made with

actual intent to defraud, they are voidable, and judgment should be entered on Count I.

**B.    Summary Judgment is Proper on Count II**

Count II is based on MCL 566.35, which states, in relevant part:

> (1) A transfer made or obligation incurred by a debtor is
> fraudulent as to a creditor whose claim arose before the transfer
> was made or the obligation was incurred if the debtor made the
> transfer or incurred the obligation without receiving a reasonably

equivalent insolvent at that time or the debtor became insolvent as
a result of the transfer or obligation.

Thus, a transfer is a voidable fraudulent transfer under MCL 566.35(1) when the debtor
did not receive "reasonably equivalent value in exchange for the transfer" and the debtor was
"insolvent" at the time of the transfer or "became insolvent as a result of the transfer[.]"

### 1. Legisi was insolvent from its inception

Because Legisi was a Ponzi scheme, it was "as a matter of law, insolvent from its
inception." *Warfield v. Byron,* 436 F.3d 551, 558 (5th Cir. 2006), citing *Cunningham v. Brown,*
265 U.S. 1, 7-8; 44 S. Ct. 424, 426; 68 L. Ed. 873 (1924) (detailing the misdeeds of Charles
Ponzi); *Terry,* 432 F. Supp. 2d at 640-641 (applying Michigan law).

Under MCL 566.32, "[a] debtor is insolvent if the sum of the debtor's debts is greater
than all of the debtor's assets at a fair valuation." MCL 566.32(1). As noted above, Legisi's
sources and uses of funds confirms that Legisi was not only a Ponzi scheme, but was insolvent
from its inception. Barrett Declaration, Exhibit A. For the first seven months of its existence,
even as it promised ridiculously high returns to investors, Legisi invested only in "HYIPs" and
lost $93,000. It only got worse from there. All of Legisi's subsequent investments failed to
generate income that could be used to pay investors the astronomical rates of return promised by
Legisi. Indeed, Legisi used over $26 Million in other investor money to repay early investors.
Its investment losses meant that Legisi could not possibly repay investors' principal, let alone
fulfill its fantastic promises to investors. Legisi was never "in the black."

### 2. Defendants did not provide "reasonably equivalent value" for the transfers

The Defendants did not provide "reasonably equivalent value" for the transfers. In
*Warfield v. Byron,* 436 F.3d 551 (5th Cir. 2006), the Court of Appeals squarely rejected a Ponzi

scheme promoter's argument that he gave "reasonably equivalent value" by recruiting other investors in the scheme, entitling him to commissions and broker fees.  The court reasoned:

> Johnson relies on his broker services to RDI as reasonably equivalent value for the transfers he received.  The primary consideration in analyzing the exchange of value for any transfer is the degree to which the transferor's net worth is preserved.  *See Butler Aviation Int'l v. Whyte,* 6 F.3d 1119, 1127 (5th Cir. 1993).  It takes cheek to contend that in exchange for the payments he received, the RDI Ponzi scheme benefited from his efforts to extend the fraud by securing new investments.  *See In re Ramirez Rodriguez,* 209 B.R. [424 (Bankr. S.D. Tex. 1997)] at 434 (stating that "as a matter of law, the Defendant gave no value to the debtors [Ponzi scheme operators] for the commissions attributable to investments made by others pursuant to the verbal agreement with [the debtors]"); *see also Martino v. Edison Worldwide Capital (In re Randy),* 189 B.R. 425, 438-39 (Bankr. N.D. Ill. 1995) (as illegal services premised on illegal contracts, broker services provided in furtherance of a Ponzi scheme do not provide reasonably equivalent value); *Dicello v. Jenkins (In re Int'l Loan Network, Inc.),* 160 B.R. 1, 16 (Bankr. D.D.C. 1993) (investors who talked up Ponzi scheme, even if they had a contract, conferred no value since enforcing an illegal contract exacerbates harm to defrauded creditors).  This argument is unacceptable.

*Warfield,* 436 F.3d at 560.

Finally, Mr. Gordon notes that Gagnon and Skordal invoked their Fifth Amendment privilege when asked about specific transfers from Legisi.  Gagnon Deposition, pp. 19, 24, 73, 194-195; Skordal Deposition, p. 16.  An adverse inference is properly drawn from this refusal to testify, *Baxter v. Palmigiano,* 425 U.S. 308, 318-319, 96 S. Ct. 1551, 47 L. Ed. 2d 810 (1976), making any argument of "good faith" or "reasonably equivalent value" even more untenable.

### C.     Judgment is Proper Against Gagnon and Skordal, as Well as Mazu

As noted in the Barrett Affidavit, Legisi made total net transfers of $3,833,259.21 directly to Mazu and/or Gagnon.  Pursuant to MCL 566.38(2) [6] judgment is proper against

---

[6] MCL 566.38(2) provides:

6645414.1 30711/132750

Gagnon and Skordal to the extent they received subsequent transfers, and against Mazu to the extent such funds were not subsequently transferred. As is detailed in the Barrett Declaration, of the total transfers of $3,833,259.21, Gagnon received $1,691,870.53 through accounts he owned and/or controlled and Skordal received $1,331,029.50 through the account he owned and/or controlled. Mazu is responsible for the remaining balance, $810,359.18.

## CONCLUSION/RELIEF REQUESTED

For all of the foregoing reasons, Plaintiff Robert D. Gordon respectfully requests that the Court grant his motion for summary judgment on Counts I and II of his Complaint, and enter judgment in his favor as follows: against Matthew J. Gagnon, $1,691,870.53; against Douglas R. Skordal, $1,331,029.50; and against Mazu Publishing, Inc., $810,359.18.

Respectfully submitted,
CLARK HILL PLC

By:  /s/ Edward J. Hood
Edward J. Hood
500 Woodward Avenue, Ste. 3500
Detroit, Michigan 48226-3435
(313) 965-8300
ehood@clarkhill.com
P42953

Date: July 21, 2010

*Attorneys for Robert D. Gordon Receiver of the Estates of Gregory N. McKnight, et al.*

---

(2) Except as otherwise provided in this section, to the extent a transfer is voidable in an action by a creditor under section 7(1)(a), the creditor may recover a judgment for the value of the asset transferred, as adjusted under subsection (3), or the amount necessary to satisfy the creditor's claim, whichever is less. The judgment may be entered against either of the following:

(a) The first transferee of the asset or the person for whose benefit the transfer was made.

(b) Any subsequent transferee other than a good-faith transferee who took for value or from any subsequent transferee.

19

## CERTIFICATE OF SERVICE

I hereby certify that on July 21, 2010, my assistant, Alyssa Theisen, electronically filed the foregoing document with the Clerk of the Court using the ECF System which will send notification of such filing upon to all attorneys of record and via U.S. Mail to Douglas Skordal, 20195 SW Pike St., Beaverton, OR 97007.

<div style="margin-left:40%">

Respectfully submitted,
CLARK HILL PLC

</div>

By:   /s/ Edward J. Hood
           Edward J. Hood
           500 Woodward Avenue, Ste. 3500
           Detroit, Michigan 48226-3435
           (313) 965-8300
           ehood@clarkhill.com
           P42953

Date: July 21, 2010            *Attorneys for Robert D. Gordon Receiver of the Estates of Gregory N. McKnight, et al.*

6645414.1 30711/132750