UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SECURITIES AND EXCHANGE
COMMISSION,

                Plaintiff,

                                           Case No.10-cv-11891

vs.                                   HON. GEORGE CARAM STEEH


MATTHEW J. GAGNON,

                Defendant.

_____/

<u>ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT,
ENTERING PERMANENT INJUNCTION AND AWARDING DISGORGEMENT, PRE-
JUDGMENT INTEREST AND CIVIL PENALTIES</u>

## I.  INTRODUCTION

On May 11, 2010, plaintiff, Securities and Exchange Commission ("Commission"),

filed the instant action alleging that defendant, Matthew J. Gagnon, violated Sections 5(a)

and 5(c) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77e(a) and 77e(c)],

Sections 17(a) and 17(b) of the Securities Act [15 U.S.C. §§ 77q(a) and 77q(b)], Section

10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §78j(b)], Rule

10b-5 thereunder [17 C.F.R. § 240.10b-5], and Section 15(a) of the Exchange Act [17

C.F.R. § 78o(a)].  The Commission moves for summary judgment on all of its claims and

for a permanent injunction enjoining Gagnon from future violations of the federal securities

laws.  For the reasons that follow, the court GRANTS the Commission's motion for

summary judgment.

## II.  FACTUAL BACKGROUND

Gagnon is the sole shareholder, officer and director of Mazu Publishing Company.

Through his company's website, www. Mazu.com, Gagnon describes himself as an Internet

business opportunity expert and since at least 1997 has billed his website as "the world's

first and largest opportunity review website."  Gagnon has reviewed for his readers various

on-line business opportunities, such as multi-level marketing programs, direct marketing,

and arbitrage trading.  He has sold materials to the general public regarding such business

opportunities, including promotional booklets and DVDs known as "Mazu Business Packs."

He also has given detailed and accurate warnings to readers about various scams and

advised readers how to spot them.   Specifically, Gagnon warned his readers about a type

of fraud referred to as a high yield investment program ("HYIP").  From at least April 2006

through at least May 2007, Gagnon provided on the Mazu website an accurate description

of a HYIP by stating that they:

> [C]ollect funds from lenders as investment capital or deposits and promise
> a return that is usually extremely high in exchange for "borrowing your
> money."  The result?  Generally, after a period of time you are free to
> withdraw your capital and or your profits, or you can "reinvest" them to earn
> additional profits.  In theory, the compounding can create a crazy return on
> investment given time.
>
>          *                      *                      *
>
> Sadly, most HYIPs are offshore fronts that don't lie within U.S. jurisdiction
> and you have no recourse when they steal your money.  Most HYIPs realize
> this and they bank on it!  They've got you right where they want you.  Most
> allude to making their profit in legitimate investment vehicles when in reality,
> you have no idea where they're making their profit.

Gagnon also warned readers about Ponzi schemes, describing such schemes as

"investment program[s] touting huge returns in a short period of time.  Any returns someone

sees are paid out of monies gathered from the investors.  No real product, investment, or

business takes place."

Through the Mazu website, Gagnon helped orchestrate a massive Ponzi scheme.[1] The Ponzi scheme, conducted by Gregory McKnight and his company Legisi Holdings, LLC, raised approximately $72.6 million from over 3,000 investors through a fraudulent, unregistered offering of investment contracts in a pooled investment program called the Legisi Program from December 2005 through at least November 2007. Gagnon had known McKnight, an underemployed auto worker, for several years having recruited McKnight to sell health care supplements for a multi-level marketing business.   Under an agreement he reached with McKnight in 2006, Gagnon and his employees solicited investors on the Mazu website from January 2006 through at least May 2007 and also promoted the Legisi Program in emails, in Mazu Business Packs, and an on-line chat room called the Legisi Forum, which was accessible through the Legisi.com website at least as late as August of 2007. Gagnon asserted on the Mazu website and in promotional materials that the Legisi Program was a 'loan program' in which investors would loan money to Legisi, and, in return, Legisi would pay investors high rates of interest.   Even though Gagnon engaged in the promotion of the Legisi Program, he has never been associated with a registered broker-dealer, and had never been registered with the Commission as a broker or dealer in any capacity.

In exchange for his promotion of the Legisi Program, Gagnon received approximately $3,613,259.00 from McKnight between January 29, 2006 and April 14,

---

[1]   This court has already determined that the Legisi Program was a Ponzi scheme in a related proceeding.  *See* Gordon v. Mazu Publishing, 09-cv-13953.

2008.[2]   Gagnon did not disclose to Legisi investors his agreement with McKnight about receiving 50% of Legisi's profits, he only advised investors that he received a referral fee for amounts invested through the Mazu website.

As this court has previously concluded, the Legisi Program was a Ponzi scheme. McKnight raised money based on his promises to invest the offering proceeds and then pay his investors each month.  The monthly payments to investors were to be funded by his investments.  McKnight represented that his monthly profits generated profits from 15% to 18%.  McKnight's promises were fraudulent.  He only invested $33,080,966.00 of the total $72,599,863.00 raised from investors.   His investments generated significant losses, totaling $3,770,000.00.  Mcknight also diverted $27,548,548.00 of the offering proceeds to make payments of purported profits to investors and used approximately $2,263,887.00 for his own use.

No valid registration statement was filed with the Commission in connection with the offer and sale of the Legisi Program investment contracts.  Gagnon never inquired into the financial status of the Legisi investors, nor did Gagnon provide the investors any financial information about the program.  Gagnon misrepresented the legitimacy of the Legisi Program, describing it as one he endorsed after thorough investigation and personal investment.  On the Mazu website, Gagnon wrote, "After having analyzed thousands of business opportunities, I can tell you that this is literally the greatest I have ever seen."  In

---

[2] McKnight transferred at least $4,532,512.00 from Legisi investors' funds to Gagnon.  *See* Mot. for Summ. J., Ex. 62 at ¶ 21.  Between February 22, 2006 through May 29, 2007, Gagnon transferred $919,253.00 to accounts controlled by McKnight. Therefore, net of transfers that Gagnon made to McKnight, Gagnon received at least $3,613,259.00 from McKnight.

a Mazu business pack, Gagnon wrote, "Legisi is a sophisticated loan program" and that "Legisi is the only genuine high yield passive income program that we at Mazu have ever found."  Gagnon further wrote that "Mazu discovered Legisi and found it was so outstanding in many areas of simplicity and earning potential that we considered it was an ideal fit for out clients and associates."   However, in reality, Gagnon performed no due diligence concerning the profitability of the Legisi Program.  He did not obtain or review any of McKnight's trading records, bank and brokerage account statements, or e-currency account records at any point prior to, or during, his  promotion of Legisi through the Mazu website or Mazu promotional materials.

Further, Gagnon knew, or recklessly disregarded warnings, that Legisi was both a HYIP and a Ponzi scheme.  He knew of no venture that McKnight had managed prior to Legisi.  Gagnon admits that he had no knowledge about the finances of the Legisi Program; he had no knowledge of the investments McKnight was making,  where he kept his money, or how McKnight was calculating profits or losses.  Despite this lack of knowledge, Gagnon wrote of the Legisi Program on the Mazu website in 2007 "10 to 12.5% of your money per month with No Work and Little to No Risk!" and "Want to earn large monthly returns without the risk and without worrying about being scammed? CLICK HERE." Gagnon also represented that McKnight invested Legisi investor funds in various investment vehicles, including foreign currencies, commodities, and stocks.  For example, Gagnon wrote on the Mazu website as it appeared between at least March 2006 and July 2006:

> We're able to tap into the very lucrative Forex (Foreign Exchange) and Comex (Commodities Exchange) arenas and also the Stock Market.  Profits from these investments as well as Internet Marketing and Arbitrage Tradng activities are used to enhance the greater program and increase stability for the long term for all participants.

Additionally, Gagnon represented that the investments made in the Legisi Program were profitable.  Gagnon stated on the Mazu website in 2006:

> Why in the world would someone pay me 12% on my money every month for doing absolutely nothing?
> That's a great question with a very simple answer... because we know how to earn more than 8.5 to 12% with it in that time in situations with minimal to no risk.  Because we can use your money, turn a profit of 15% or 20%, or better, pay your 10 or 12%, and still walk away with a handsome profit.

In reality, Gagnon did not actually know the results of the investments made by McKnight, and informed investors that the Legisi payments made to them were from profits generated from investments, without actual knowledge of the source of the money that McKnight paid to investors.

After the arrangement with McKnight ceased, Gagnon continued to offer investment contracts, purportedly to finance the purchase of resort properties and other real estate ("Real Estate Program").  Gagnon represented to investors that he and two partners had started a new company to invest in real estate.  Between August of 2007 through September of 2007, through the Real Estate Program, Gagnon raised approximately $361,865.00 from approximately 21 investors.   Gagnon used the Mazu website to solicit investors. Gagnon would send out an email with a link to the Mazu website, when the email message recipient clicked on the link, he or she would be taken to the website where Gagnon wrote about his new Real Estate Program.   Gagnon asserted on the Mazu website that the Real Estate Program was a loan program through which investors would loan money to Gagnon and in return he would pay investors high rates of interest.  Gagnon offered two investment options on the Mazu website and in emails to investors. He

promised a 24% annual return on their investment, plus the return of their original investment, or with a minimum investment of $10,000.00 a 200% annual return, plus the return of their original investment, payable in 14 months. He indicated that the Real Estate Program would generate "between 300% to 1,000% return in 18 to 24 months." Gagnon told investors that the Real Estate Program would be 100% SEC compliant and that Wells Fargo Bank was monitoring the program.

No valid registration statement was filed with the Commission in connection with Gagnon's offer and sale of the Real Estate Program investment contracts. Between June 13, 2007 through September 17, 2007, Gagnon sent at least $800,000.00, which included the $361,865.00 in investor money to accounts in the name of Trails Home LLC, which was controlled by Bryan Foster, Gagnon's alleged partner. Gagnon conducted no due diligence or investigation into Foster or Trails Home or the purported real estate properties before he began offering the Real Estate Program to investors. He did not perform a background check of Foster or Trails Home's financial or account statements, he simply relied on Foster's representations without conducting any independent investigation into Foster's background.

If Gagnon had performed due diligence, he would have discovered that Foster had been convicted of fraud–twice–before the Real Estate Program. When Gagnon learned that someone with the same name as Bryan Foster had been convicted of fraud, he accepted Foster's representation that it was not him. Gagnon continued to offer the Real Estate Program to investors after Foster represented that he had not been convicted of fraud, even though Gagnon did no independent investigation to confirm Foster's denials. Additionally, there were reasons for Gagnon to believe that Foster's representations

concerning the profitability of the Real Estate Program were false.  Trails Home issued a promissory note to Mazu Publishing on July 12, 2007 with a principal amount of $250,000.00 and an interest rate of 12% to be paid on August 11, 2007.  Trails Home did not make payments on the note until November 1, 2007.  Ultimately the Real Estate Program lost at least $256,865.00 of the investors' money.

Additionally, from at least April 30, 2009 through at least July 1, 2009, Gagnon conducted yet another fraudulent, unregistered offering of investment contracts ("Managed Forex Trading Offering").  Gagnon's friend, Jeff Kinseth, was to use the investors' money to trade in Forex in his own accounts.  Here again, no valid registration statement was filed with the Commission in connection with Gagnon's offer of investment contracts from the Managed Forex Trading Offering.  Gagnon similarly solicited investors through the Mazu website in much the same way as he promoted the Legisi Program and the Real Estate Programs. Gagnon offered two investment options for the Managed Forex Trading Offering, each required a minimum investment of $10,000.00.  The first promised a monthly return of 2% paid quarterly.  The second option offered an annual return of 30% return paid annually.

Gagnon represented that Kinseth was a successful Forex trader.  Between April of 2009 through July of 2009, Gagnon stated on the Mazu website that Kinseth "has been doing very, very well trading Forex for the last couple of years" and that Kinseth was a "very competent trader."  In fact, Kinseth was a novice who had learned what he knew of Forex trading through self-study courses available on the Internet.  Kinseth was never successful as a Forex trader, realizing losses of at least $154,571.00 from July 17, 2008 through April 30, 2009.  Gagnon never reviewed Kinseth's trading accounts or finances, and had not

-8-

conducted any other due diligence into Kinseth's finances or his trading results before he offered the Managed Forex Offering on the Mazu website. If he had, he would have discovered that Kinseth only traded a fraction of the money entrusted to him for trading. For instance, Kinseth received approximately $706,500.00 from Gagnon and others to trade in the Forex market, however he only sent $242,600.00 to Forex trading accounts.

Further, both before and during his promotion of the Managed Forex Trading Offering, Gagnon recklessly ignored several warning signs that Kinseth's trading was not as successful as Gagnon claimed on the Mazu website.  For instance, several of the checks that Kinseth wrote to Gagnon bounced, however Gagnon continued to represent that Kinseth was a successful Forex trader until at least July 2009 and did not review Kinseth's trading records until January of 2010.

Gagnon continues to operate the Mazu website and the Commission argues he is a danger to the investing public.  In October and November of 2009, he offered investors a new opportunity for managed Forex trading, and claimed monthly profits averaging 10%. He explained that "I have a trader I represent in Europe that can trade your funds in a managed account." Gagnon promised that investors in the European Trade Offer would experience "consistent monthly profits" and "very few losing trades."  Apparently, the European trader is "Juju," who is Jjunju Kateregga, a Ugandan national residing in Finland. Gagnon promoted Juju's trading prowess after meeting him on the internet, exchanging emails and talking to him on the phone "a few times."  As recently as April of 2010, Gagnon promised that details of yet another managed trading opportunity would be coming shortly. Gagnon promised that his trader "has averaged over 5% + to 8% per month for his clients (after his fee)."  Gagnon's gross pecuniary gain related to the Legisi Program, the Real

Estate Program and the Managed Forex Trading Offering totals $4,754,512.21. *See* Mot. for Summ. J., Ex. 62 at ¶ 7, Ex. A.

## III.  PROCEDURAL HISTORY

The Commission filed a six-count complaint against Gagnon on May 11, 2010.  The Complaint alleges that Gagnon violated the federal securities laws in connection with the Legisi Program, the Real Estate Program and the Managed Forex Trading Offering. Gagnon filed an Answer and admitted many of the Commission's allegations. *See* Dkt. No. 15.  Also, on May 11, 2010, the Commission filed a motion for preliminary injunction, an asset freeze, and other relief.  The court granted an asset freeze and issued a preliminary injunction by stipulation.

The parties embarked on discovery.  Gagnon was deposed, as well as several of his victims, including Lori Kwityn, Alfred LaGear, Patrick Lim, Robert Niels, and David Parson.  The Commission also served interrogatories, requests to admit, and document requests.  Gagnon failed to respond to the Commission's interrogatories and document requests.  On March 1, 2011, after the Commission filed a motion to compel, the court entered an order requiring Gagnon to cooperate in the discovery process.

> Defendant Gagnon shall produce all documents responsive to the SEC's First Set of Document Requests and shall fully answer the SEC's First Set of Interrogatories on or before March 14, 2011.  Defendant Gagnon is deemed to have waived any objections to the SEC's document requests and interrogatories.
>
> \*                      \*                      \*
>
> In the event that he fails to comply, Defendant Gagnon shall be precluded from offering at summary judgment or at trial any evidence that falls within the scope of discovery in the SEC's First Set of Document Requests, the SEC's First Set of Interrogatories[.]

*Id.* (citing Fed. R. Civ. P. 37(b)(2)(A)(ii) & (vii).  Gagnon did not produce any documents

to the SEC after this court issued its March 1, 2011 order; claiming in an email that he had nothing else to produce.  On March 21, 2011, Gagnon responded to the Commission's First Set of Interrogatories, although he failed to fully answer by either providing piecemeal information or by failing to provide any information at all.  See Mot. for Summ. J., Ex. 11. Gagnon submitted responses to the Commission's Second Set of Requests for Admission, however his answers were late and unsigned.[3]

## IV.  ANALYSIS

### A.  Standard of Review

Federal Rule of Civil Procedure 56(c) empowers the court to render summary judgment "forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."_ See Redding v. St. Eward, 241 F.3d 530, 532 (6th Cir. 2001).  The Supreme Court has affirmed the court's use of summary judgment as an integral part of the fair and efficient administration of justice.  The procedure is not a disfavored procedural shortcut.  Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986); see also Cox v. Kentucky Dept. of Transp., 53 F.3d 146, 149 (6th Cir. 1995).

The standard for determining whether summary judgment is appropriate is "'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" Amway Distributors

---

[3]  Under the Federal Rules of Civil Procedure, a "matter is admitted unless, within 30 days after being served, the party to whom the request is directed serves on the requesting party a written answer or objection addressed to the matter and signed by the party or its attorney."  Fed. R. Civ. P. 36(a)(3).

*Benefits Ass'n v. Northfield Ins. Co.*, 323 F.3d 386, 390 (6th Cir. 2003) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)). The evidence and all reasonable inferences must be construed in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Redding*, 241 F.3d at 532 (6th Cir. 2001). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original); *see also National Satellite Sports, Inc. v. Eliadis, Inc.*, 253 F.3d 900, 907 (6th Cir. 2001).

If the movant establishes by use of the material specified in Rule 56(c) that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law, the opposing party must come forward with "specific facts showing that there is a genuine issue for trial." *First Nat'l Bank v. Cities Serv. Co.*, 391 U.S. 253, 270 (1968); *see also McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000). Mere allegations or denials in the non-movant's pleadings will not meet this burden, nor will a mere scintilla of evidence supporting the non-moving party. *Anderson*, 477 U.S. at 248, 252. Rather, there must be evidence on which a jury could reasonably find for the non-movant. *McLean*, 224 F.3d at 800 (citing *Anderson*, 477 U.S. at 252).

### B.  Section 5(a) and (c) of the Securities Act (Count I)

As a threshold matter, the federal securities laws govern the investments at issue in this action. Section 2(a)(1) of the Securities Act of 1933 and Section 3(a)(10) of the Securities Exchange Act of 1934 define security to include, among other things, "investment contracts." See 15 U.S.C. § 77b(a)(1); 15 U.S.C. § 78c(a)(10). An investment

-12-

contract exists if (1) a person invests his or her money, (2) in a common enterprise, and (3) is led to expect profits solely from the efforts of the promoter or a third party.  *See SEC v. Edwards*, 540 U.S. 389, 394 (2004); *see also, SEC v. W.J. Howey Co.*, 328 U.S. 293, 298-99 (1946).  Horizontal commonality exists if the "funds of two or more investors . . . go into a 'common pool from which all may benefit.'" *Stone v. Kirk*, 8 F. 3d 1079, 1085 (6th Cir. 1993) (quoting *Newmeyer v. Philatelic Leasing, Ltd.*, 888 F. 2d 385, 394 (6th Cir. 1989)).

Here, all the investors in the Legisi, Real Estate and Managed Forex Trading ventures made, or were solicited to make investments of money.   Over 3,000 people invested more than $72,600,000.00 in the Legisi venture, roughly 21 individuals invested at least $361,864.00 in the Real Estate Program and members of the public were solicited to invest in the Managed Forex Offering.  Further, both the Legisi and Real Estate ventures involved a common enterprise where "funds of two or more investors . . . [went] into a 'common pool from which all may benefit.'" *Stone v. Kirk*, 8 F. 3d 1079, 1085 (6th Cir. 1993).  Additionally, the investors in both the Legisi and Real Estate Program ventures were motivated to earn profits evidenced by their motivation to invest solely by the desire to earn returns rather by a desire to use or consume the item purchased.  *See United Housing Found., Inc., v. Forman*, 421 U.S. 837, 852-53 (1975). Lastly, the expectation of profits was to be derived from the entrepreneurial efforts of McKnight and his Legisi Program and Gagnon and Foster's efforts in relation to the Real Estate Program.  Therefore, Gagnon offered and sold securities within the meaning of the Securities and

Exchange Acts.[4]

The Commission argues that Gagnon's offering and sale of securities in the Legisi and Real Estate Programs, and his offer of securities in the Managed Forex Offering violated the registration provisions found in Sections 5(a) and 5(c) of the Securities Act. Specifically, Section 5(a) states:

(a) Sale or delivery after sale of unregistered securities. Unless a registration statement is in effect as to a security, it shall be unlawful for any person, directly or indirectly–
(1) to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell such security through the use or medium of any prospectus or otherwise; ...

15 U.S.C. § 77e(a).  Section 5(c) states:

(c) Necessity of filing registration statement.  It shall be unlawful for any person, directly or indirectly, to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy through the use or medium of any prospectus or otherwise any security, unless a registration statement has been filed as to such security, . . . .

15 U.S.C. § 77e(c). "The purpose of Section 5[] is to protect investors by requiring publication of certain information concerning securities before they are offered for sale." *S.E.C. v. Great Lakes Equities Co.*, no. 89-cv-70601, 1990 WL 260587, *15 (E.D. Mich. Sept. 4, 1990).

---

[4] It should be noted that Gagnon offered at least one individual a promissory note in exchange for her investment in the Real Estate Program.  Both the Securities Act and Exchange Act include "notes" in the definition of security.  *See* 15 U.S.C. § 77b(a)(1); *see also*, 15 U.S.C. § 78c(a)(10); *see also, Reves v. Ernst & Young*, 494 U.S. 56 (1990) (notes are presumed to be securities unless presumption rebutted).  Under the *Reves* test, Gagnon's promissory note is a security.  *Id.* at 65-68. In any event, Gagnon does not dispute that he was offering or selling securities as defined under the Securities Act and Exchange Act.

-14-

In order to establish a *prima facie* case for violations of Section 5 of the Securities Act, the Commission must show that (1) no registration statement was filed or in effect for the offering; (2) the defendant, either directly or indirectly, sold or offered to sell the security; and (3) the defendant made use of interstate facilities or the mails. *See S.E.C. v. Continental Tobacco Co.*, 463 F.2d 137, 155 (5th Cir. 1972); *Great Lakes Equities*, 1990 WL 260587, at *16. The Securities Act broadly defines "offers to sell" to include "every attempt or offer to dispose of . . . a security or interest in a security for value." 15 U.S.C. § 77b(a)(3). Such efforts include "any document which is designed to procure orders for a security." *In the Matter of Carl M. Loeb*, 38 S.E.C. 843, 849 (1959) (holding that press releases issued by underwriters before the issuer filed a registration statement constituted an offer to sell). Once the Commission establishes its *prima facie* case, the burden is on the defendant to demonstrate that the securities offered qualify for a registration exemption. *See S.E.C. v. Ralston Purina Co.*, 346 U.S. 119, 126 (1953); *Great Lakes Equities*, 1990 WL 260587, at *16.

The Commission has established a *prima facie* case of securities violations under Sections 5(a) and 5(c) of the Securities Act in connection with the Legisi Program. The securities Gagnon offered for sale were not registered with the Commission. He offered the Legisi Program securities through (1) statements that he and Mazu employees posted on the Mazu website and the Legisi Forum; (2) the link that the Mazu website provided to the Legisi website; and (3) the assistance given to prospective investors by his employees. Gagnon has failed to come forth with any evidence that the securities offered qualify for a registration exemption. He did not inquire into the financial net worth, investment experience, or state of residence of prospective investors in Legisi, therefore an exemption

under Rule 506 is inapplicable.  *See* 17 C.F.R. § 230.506; *see also*, Mot. for Summ. J., Ex. 8, Second Req. for Adm. ¶ 70; Ex. 42, Lim Dep. Tr. at 59-60; Niels Dep. Tr. at 94-95; Ex. 35, Kwityn Dep. Tr. at 49-50; 70-71; Ex. 48, Parson Dep. Tr. at 7-12).  Gagnon did not provide prospective investors in Legisi with any financial statements from Legisi rendering an exemption under § 4 of the Securities Act inapplicable.  *Id.*, Ex. 8, Second Req. for Adm. ¶ 70; Ex. 46, Niels Dep. Tr. at 93-94; Ex. 35 Kwityn Dep. Tr. at 48-49; Ex. 42, Lim. Dep. Tr. at 60.

Further, in his response to the Commission's motion, Gagnon admits that he violated Section 5(a) and 5(c) of the Securities Act.  *See* Def.'s Resp. at 8 ("I affirm I violated section 5 a [sic] and 5c [sic] of the Securities Act due to Legisi only.").  The gist of Gagnon's argument is that he did not know that the Legisi Program was a fraud.  A defendant must offer more than mere denials to defeat summary judgment.  *See S.E.C. v. Platforms Wireless Int'l Corp.*, 617 F. 3d 1072, 1094 (9th Cir. 2010); *Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F. 3d 702, 704 (7th Cir. 2008); *S.E.C. v. Lyttle*, 538 F. 3d 601, 603 (7th Cir. 2008).  Additionally, scienter extends to both intentional falsehoods and "reckless disregard for the truth."  *See S.E.C. v. George*, 426 F. 3d 786, 795 (6th Cir. 2005).  Thus, Gagnon's claims that "only McKnight truly knew what was going on," and "[w]hen we questioned McKnight we were told some if it was none of our business."  Thus, Gagnon's claimed ignorance demonstrates his liability because he represented to his investors that he had fully researched McKnight and the Legisi Program.  Gagnon also maintains that the Commission's spreadsheets are not evidence because they are bank records.  *See* Resp. at 7.  This is inaccurate, the Commission provided the supporting declaration of R. Kevin Barrett, an Accountant working for the Commission.  *See* Mot. for Summ. J., Ex. 62.  The

-16-

spreadsheets qualify as a summary under Rule 1006.  *See* Fed. R. Evid. 1006.  Lastly, Gagnon's argument that exculpatory evidence was seized by the Commission is without merit.  This court already ruled against him on this argument.  *See* Gordon v. Mazu Publishing Inc., No. 09-cv-13953 ("Defendant cannot claim that evidence exists on the seized computers when, prior to the search of his residences, he testified that information relating to Legisi Holdings was not in his possession.")

Gagnon also violated Sections 5(a) and 5(c) of the Securities Act in connection with the Real Estate Program.  No registration statement was filed or in effect with the Commission in connection with the offer and sale of the Real Estate Program investment contracts.  Gagnon offered and sold interest in the Real Estate Program through statements that he posted on the Mazu website and in emails.  Thus, Gagnon used interstate communication and the mails in connection with the sale and offer for sale of the real estate securities.  Therefore, the Commission has established a *prima facie* case of securities violations under Sections 5(a) and 5(c) of the Securities Act in connection with the Real Estate Program.  Further, Gagnon has not carried his burden demonstrating that an exemption to registration applies.  He did not inquire into the financial net worth, investment experience, or state of residence of prospective investors in the Real Estate Program.  *See* Mot. for Summ. J., Ex. 8, Sec. Req. for Adm. ¶ 81, Ex. 35, Kwityn Dep. Tr. at 70-71; Ex. 48, Parson Dep. Tr. at 7, Ex. 52, Raymond Dep. Tr. at 34.  Nor did he provide any investors with any financial statements, thus there can be no exemption under § 4 of the Securities Act because the investors did not have the same information that registration would have disclosed.  Gagnon merely argues that he "only collected money from a small handful of people" and that they were "his own clients."  This is insufficient to establish a

question of fact exists as to his violation of Sections 5(a) and 5(c) in connection with the Real Estate Program.  The Commission is entitled to summary judgment on count I.

C.  Section 10(b) of the Exchange Act, Rule 10b-5 and Section 17(a) of the Securities Act (Counts II, III and V)

Section 17(a) of the Securities Act, Section 10(b) of the Exchange Act, and Rule 10b-5 are essentially coextensive.  All prohibit any person in the offer or sale of any security from, directly or indirectly, employing any device, scheme, or artifice to defraud, obtaining money or property by means of any untrue statement of material fact or omitting to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, or engaging in any transaction, practice or course of business that operates as a fraud or deceit upon the purchaser.  *See* 15 U.S.C. §§ 77q(a), 78j(b), and 17 C.F.R. § 240.10b-5.  A fact is material if there is a substantial likelihood that a reasonable investor would consider it important in making an investment decision.  *See T.S.C. v. Northway, Inc.*, 426 U.S. 438 (1976). Scienter is a requirement to establish violation of Section 17(a) of the Securities Act, Section 10(b) of the Exchange Act, and Rule 10b-5  thereunder.  *See Ernst & Ernst v. Hochfleder*, 425 U.S. 185, 193 (1976). The Commission must therefore demonstrate the defendant's scienter, or "a mental state embracing intent to deceive, manipulate, or defraud."  *Id.*

Gagnon praised Legisi as a low-risk, high yield program, promising investors they would earn "10 to 12.5% on your money per month with No Work and Little to No Risk!" He represented that he had thoroughly researched Legisi and McKnight, and gave both his stamp of approval.  Further, Gagnon acted with scienter, he knew McKnight was an

-18-

underemployed auto worker who sold health supplements for extra income.  He performed no due diligence; he took McKnight's representations at face value without reviewing any supporting documents to confirm McKnight's claims of exorbitant returns. Gagnon was in a position to know that Legisi was nothing other than a Ponzi scheme which he described as "an investment program touting huge returns in a short period of time" on the Mazu website.  He also failed to disclose that he and McKnight were splitting the "profits" 50/50." Similarly, Gagnon's statements in connection with the Real Estate Program were  made with the intent to deceive, he claimed it was SEC compliant, Wells Fargo was monitoring it, and promised returns of 200% within two years.  All of these statements were made without basis in fact.  The Commission is entitled to judgment in its favor on counts II, III and V.

### D.  Section 17(b) of the Securities Act (Count IV)

Section 17(b) of the Securities Act, commonly known as the "anti-touting" provision prohibits the practice of publicizing securities in return for past or future undisclosed compensation from an issuer[5], underwriter or dealer. *See* 15 U.S.C. § 77q(b); *see also, S.E.C. v. Liberty Capital Group Inc.*, 75 F. Supp. 2d 1160, 1162 (W.D. Wash. 1999). Specifically, Section 77q(b) states:

> (b) Use of interstate commerce for purposes of offering for sale.  It shall be unlawful for any person, by the use of a any means or instruments of transportation or communization in interstate commerce or by the use of mails, to publish, give publicity to, or circulate any notice, circular,

---

[5]  McKnight is an 'issuer' as that term is defined under the Securities Act. Specifically, an issuer is defined as "every person who issues or proposed to issue any security; . . . the person or persons performing the acts and assuming the duties of depositor or manager pursuant to the provisions of the trust or other agreement or instrument under which such securities are issued . . . ."  *See* 15 U.S.C. § 77b(a)(4).

advertisement, [] or communication which, though not purporting to offer a security for sale, describes such security for a consideration received or to be received, directly or indirectly, from an issuer, underwriter, or dealer, without fully disclosing the receipt, whether past or prospective, of such consideration and the amount thereof.

15 U.S.C. § 77q.  Scienter is not an element of Section 17(b).  *See Liberty Capital Group*, 75 F. Supp. 2d at 1162 ("[T]he plain meaning of § 17(b) excludes an element of intent . . . .").  Congress enacted this provision to meet the evils of the 'tipster sheet,' as well as articles in newspapers or periodicals that purport to give an unbiased opinion but which opinions in reality are bought and paid for.  *See S.E.C. v. Wall Street Publishing Institute, Inc.*, 851 F. 2d 365, 369 n.6 (D.C. Cir. 1988).  The language of Section 17(b) is broad, reaching any "person" who publicizes "any notice, circular, advertisement, newspaper, article, letter, investment service, or communication."  15 U.S.C. § 77q(b).

Gagnon had an agreement with McKnight to receive 50% of Legisi's "profits" resulting from investments made through the Mazu website.  Gagnon represented to investors that he was recommending the Legisi program based on his personal investigation.  He wrote on his website that I "earn commissions on the money that I bring in, but I will hardly get rich teaching this to folks [on the Mazu website]."  He did not disclose that in fact he received roughly $3,613,259.00 from McKnight in exchange for his promotion of the Legisi Program.  Because Gagnon never "fully disclos[ed]" his personal financial interest in the Legisi Program, he has violated Section 17(b) of the Securities Act and the Commission is entitled to judgment in its favor on count IV.

E.  Section 15(a) of the Exchange Act (Count VI)

Section 15(a)(1) of the Exchange Act makes it illegal for a "broker" to effect

-20-

transactions in, or to induce or attempt to induce the purchase or sale of, any security unless such broker is registered with the Commission or, in the case of a natural person, is associated with a registered broker-dealer.  See 15 U.S.C. § 78o(a)(1).  A broker is defined as any person "engaged in the business of effecting transactions in securities for the accounts of others."  *See* 15 U.S.C. § 78c(a)(4).  The "engaged in the business" element is satisfied by a showing that the defendant actively solicited securities" and participated "at key points in the chain of distribution."  *See Mass. Fin. Servs., Inc. v. Securities Investor Protection Corp.*, 411 F. Supp. 411, 415 (D. Mass.1976).    Activities that indicate that a person may be a "broker" include: (1) solicitation of investors to purchase securities; (2) involvement in negotiations between the issuer and the investor; and (3) receipt of transaction-related compensation.  *See S.E.C. v. Hansen*, No. 83-3692, 1984 U.S. Dist. LEXIS 17835 (S.D.N.Y.).

Gagnon acted as a broker in violation of Section 15 of the Exchange Act.  He solicited persons to purchase Legisi securities, acting as the link between the issuer and the investor.  He received transaction-based compensation in the form of referral commissions.  He also advised investors about the merits of the Legisi Program.  He was not registered with the Commission as a broker, nor associated with a registered broker-dealer.  See Mot. for Summ. J., Ex. 2, Ans. ¶ 13.  Therefore, the Commission is entitled to judgment in its favor on this claim.

### F.  Permanent Injunction

The Commission is entitled to injunctive relief if it establishes that Gagnon has violated and is likely to violate the securities laws.  *See S.E.C. v. Professional Associates*, 731 F. 2d 349, 353 (6th Cir. 1984); *S.E.C. v. Youmans*, 729 F. 2d 413, 415 (6th Cir. 1984).

When assessing whether there is a likelihood of future violations, courts look at the "totality of the circumstances" including the following factors: (1) the gravity of harm caused by the offense; (2) the extent of the defendant's participation; (3) the defendant's degree of scienter; (4) the isolated or recurrent nature of the infraction; (5) the likelihood that defendant's customary business activities might again involve him or her in such transactions; (6) the defendant's recognition of his or her own culpability; and (7) the sincerity of assurances against future violations.  *Youmans*, 729 F. 2d at 415.

All of these factors weigh in favor of entering a permanent injunction.  Gagnon has repeatedly violated the federal securities laws.  He offered unregistered securities on behalf of McKnight, and he did so based on false representations that he performed due diligence. Due to Gagnon's conduct, McKnight was able to raise approximately $72.6 million from over 3,000 investors, who suffered losses totaling $45,051,315.00.  He further harmed the investing public with his conduct in connection with the Real Estate Program, causing them to suffer losses equaling at least $239,865.00.

Additionally, Gagnon acted with a high degree of scienter.  He purposefully built up an image of trustworthiness in the on-line investing community and exploited this trust.  He had no basis for the representations he made concerning the Legisi, Real Estate or Managed Forex Trading Offering.  He concealed how much he was earning in commissions from McKnight, claimed that the Real Estate Program was SEC compliant and was monitored by Wells Fargo, as well as knew that Kinseth owed him tens of thousands of dollars, yet continued to represent that the Managed Forex Trading Offering would generate exorbitant returns.  Gagnon has shown no remorse for his conduct, rather he claims he was a victim of the Legisi Program and has tried to downplay his culpability in

connection with the Real Estate Program by arguing that he only collected money from a small handful of people.  Therefore, a permanent injunction is necessary to protect the investing public.

### G.  Equitable Relief

The Commission also argues that the court should order disgorgement of ill gotten gains, prejudgment interest and impose civil penalties.  Section 22(a) of the Securities Act and Section 27 of the Exchange Act confer general equity powers upon the court in a suit by the Commission.  *See* 15 U.S.C. § 77v(a); 15 U.S.C. § 78aa.  The equitable remedies include the disgorgement of ill gotten gains and prejudgment interest.  *See S.E.C. v. First Jersey Sec., Inc.*, 101 F. 3d 1450, 1474 (2d Cir. 1996); *S.E.C. v. Moran*, 944 F. Supp. 286, 295 (S.D.N.Y. 1996).  The purpose of disgorgement is to deprive violators of their ill-gotten gains, thereby effectuating the deterrence objectives of the securities laws.  *See S.E.C. v. First Jersey Sec., Inc.*, 101 F. 3d 1450, 1474 (2d Cir. 1996) (citations omitted).  "In the Sixth Circuit, the general rule is that securities law violators must disgorge all profits received from their illicit conduct.  *See S.E.C. v. Blavin*, 760 F. 2d 706, 713 (6th Cir. 1985); *see also*, *S.E.C. v. Great Lakes Equities Co.*, 775 F. Supp. 211, 214 (E.D. Mich. 1991).  All doubts concerning the amount of disgorgement must be resolved against the wrongdoer.  *Id.* at 214.    In his responsive brief, Gagnon fails to address the Commission's request for disgorgement of ill-gotten gains.  Accordingly, the court grants the Commission's request for disgorgement of Gagnon's ill-gotten gains in the amount of $3,613,259.00, which represents the amount Gagnon received from McKnight in connection with the Legisi Program offering.

The Commission argues that an award of prejudgment interest is warranted because

Gagnon profited at the expense of his investors, who lost over $45,000,000.00 in the Legisi Ponzi scheme alone.   Prejudgment interest is another equitable remedy that prevents defendants from obtaining the benefit of an interest-free loan procured through their illegal activity.  *See S.E.C. v. Jakubowski*, No. 94-4539, 1997 WL 598108, at *2 (N.D. Ill. 1997) (quoting S.E.C. v. Moran, 944 F. Supp. 286, 295 (S.D.N.Y. 1996)), *aff'd*, 150 F.3d 675 (7th Cir. 1998)."The personal wrongdoing of a defendant should be considered in determining that an award of interest is in accord with doctrines of fundamental fairness."  *S.E.C. v. Musella*, 748 F. Supp. 1028, 1042-43 (S.D.N.Y.  1989).   "In the context of a Section 10(b) and Rule 10b-5 actions, proof of scienter is sufficient to justify an award of prejudgment interest."  *Id.* at 1043.

The Commission argues that prejudgment interest on $3,613,259.00, the net amount Gagnon received from McKnight, totals $488,570.47.  This figure represents the  amount of interest accrued applying the interest rate, adjusted quarterly, used by the Internal Revenue Service for computation of interest on underpayment of taxes, beginning on April 15, 2008 (the day after final receipt of money from McKnight) to March 31, 2011. *See S.E.C. v. First Jersey Sec. Inc.*, 101 F. 3d 1450, 1476 (2d Cir. 1996) (noting that courts have approved the use of the IRS underpayment rate in connection with disgorgement and finding that the time frame applicable to imposition of prejudgment interest usually begins with the date of the unlawful gain through the entry of judgment.)  Gagnon fails to address the Commission's request for prejudgment interest in his response brief.  Therefore, the court concludes that prejudgment interest in the amount of $488,570.47 is appropriate.

Finally, the Commission seeks a "third-tier" penalty in the amount equal to Gagnon's gross pecuniary gains.  A "third-tier" penalty under the securities laws is imposed when the

-24-

defendant's conduct involved "fraud, deceit, manipulation or a deliberate or reckless disregard of a regulatory requirement [and] directly or indirectly resulted in substantial losses to other persons." *See* 15 U.S.C. § 77t(d); 15 U.S.C. § 78u(d)(3).  The maximum penalty for each violation for individuals is the greater of $100,000 or the gross amount of pecuniary gain to the individual resulting from the violation. *See* 15 U.S.C. § 78u(d)(3)(B)(iii).

The court may consider several factors in determining whether to award civil penalties, including "the egregiousness of the violations, the degree of scienter involved, the deterrent effect given the defendant's financial worth, and other penalties arising from the conduct." *S.E.C. v. Yun*, 148 F. Supp. 2d 1287, 1295 (M.D. Fla. 2001).  Gagnon fails to address the Commission's request for civil penalties in his response brief.  Gagnon's gross pecuniary gain related to the Legisi Program, the Real Estate Program and the Managed Forex Trading Offering totals $4,754,512.21. As described above, Gagnon repeatedly committed egregious violations of the federal securities laws and acted with a high degree of scienter. However, because the court also grants a permanent injunction enjoining defendant from further violating the federal securities laws, the court concludes that a civil penalty in the amount of $100,000.00 is appropriate.

## V.  CONCLUSION

Accordingly,

The Commission's motion for summary judgment is GRANTED.

It is HEREBY ORDERED that defendant and his agents, servants, employees, attorneys and all persons in active concert or participation with them who receive actual notice of this Order by personal service or otherwise are permanently enjoined from

violating Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. § § 77e(a) and 77e(c)] by, directly or indirectly, in the absence of any applicable exemption:

(a) Unless a registration statement is in effect as to a security, making use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell such security through the use or medium of any prospectus or otherwise;

(b)  Unless a registration statement is in effect as to a security, carrying or causing to be carried through the mails or in interstate commerce, by any means or instruments of transportation, any such security for the purpose of sale or for delivery after sale; or

(c) Making use of any means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy through the use or medium of any prospectus or otherwise any security, unless a registration statement has been filed with the Commission as to such security, or while the registration statement is the subject of a refusal to order or (prior to the effective date of the registration statement) any public proceeding or examination under Section 8 of the Securities Act [15 U.S.C. § 77h].

IT IS HEREBY ORDERED that defendant and defendant's agents, servants, employees, attorneys, and all persons in active concert or participation with them who receive actual notice of this Order by personal service or otherwise are permanently enjoined from violating Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)] in the offer or sale of any security by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly:

(a) to employ any device, scheme, or artifice to defraud;

(b) to obtain money or property by means of any untrue statement of a material fact

or any omission of a material fact necessary in order to make the statements made in light of the circumstances under which they were made, not misleading; or

(c) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

IT IS HEREBY ORDERED that defendant and defendant's agents, servants, employees, attorneys, and all persons in active concert or participation with them who receive actual notice of this Order by personal service or otherwise are permanently enjoined from violating Section 17(b) of the Securities Act [15 U.S.C. § 77q(b)] in the offer or sale of any security by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly, to publish, give publicity to, or circulate any notice, circular, advertisement, newspaper, article, letter, investment service, or communication which, though not purporting to offer a security for sale, describes such security for a consideration received or to be received, directly or indirectly, from an issuer, underwriter, or dealer, without fully disclosing the receipt, whether past or prospective, of such consideration and the amount thereof.

IT IS HEREBY ORDERED that defendant and defendant's agents, servants, employees, attorneys, and all persons in active concert or participation with them who receive actual notice of this Order by personal service or otherwise are permanently enjoined from violating, directly or indirectly, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 promulgated thereunder [17 C.F.R. § 240.10b-5], by using means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange, in connection with the purchase or sale of any security:

(a) to employ any device, scheme, or artifice to defraud;

(b) to make any untrue statement of a material fact to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or

(c) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.

IT IS HEREBY ORDERED that defendant and defendant's agents, servants, employees, attorneys, and all persons in active concert or participation with them who receive actual notice of this Order by personal service or otherwise are permanently enjoined from violating Section 15(a) of the Exchange Act [15 U.S.C. § 78o(a)] while acting as a broker or dealer, to make use of the mails or any means or instrumentality of interstate commerce to effect any transactions in, or to induce or attempt to induce the purchase or sale of, any security (other than an exempted security or commercial paper, banker's acceptances, or commercial bills) unless such broker or dealer is registered with the Commission in accordance with Section 15(a)(2) of the Exchange Act.

IT IS HEREBY ORDERED that defendant Gagnon is liable for $3,613,259.00 in disgorgement, $488,570.47 in prejudgment interest, and $100,000.00 in civil penalties.

SO ORDERED.

Dated: March 22, 2012

S/George Caram Steeh
GEORGE CARAM STEEH
UNITED STATES DISTRICT JUDGE

CERTIFICATE OF SERVICE

Copies of this Order were served upon attorneys of record on
March 22, 2012, by electronic and/or ordinary mail and also to
Matthew Gagnon at 5433 Northwest Skycrest Parkway,
Portland, OR 97229.


S/Josephine Chaffee
Deputy Clerk